# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CELESTINE SUMPTER,**

          **Plaintiff,**

**-vs-**                               **Case No.  6:04-cv-996-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

          **Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by
Celestine Sumpter, seeking review of the final decision of the Commissioner of Social Security
denying her claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered
the Complaint and filed a certified copy of the transcript of the proceedings before the Social
Security Administration.  Doc. Nos. 10, 11.  This matter has been referred to me under 28 U.S.C. §
636(c) pursuant to the consent of the parties.

## I.   PROCEDURAL HISTORY.

In October 2001, Sumpter filed an application for a period of disability and disability
insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program
(OASDI), 42 U.S.C. § 401 *et seq*.  TR. 43-47.  Sumpter's claim was denied, initially and upon
reconsideration.  Sumpter requested a hearing before an administrative law judge (ALJ), which was
held on December 3, 2003.  TR. 223-35.  Sumpter, who was represented by an attorney, testified at
the hearing. *Id*.; *see also* TR. 27.

After considering the testimony and the medical evidence presented, the ALJ found that Sumpter had not engaged in substantial gainful activity since 2002.  TR. 13.[1]  The ALJ concluded that the medical evidence indicated that Sumpter suffered from degenerative joint disease and osteoarthritis of the knees, hypertension, diabetes mellitus, morbid obesity, chest wall soreness with trigger points, and depression.  TR. 13, 19.  The ALJ determined that Sumpter's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  TR. 13.

The ALJ determined that Sumpter's mental impairment had resulted in "mild limitations with regard to her ability to perform daily activities, mild limitations with regard to her ability to maintain social functioning, [and] moderate limitations with regard to her ability to maintain concentration, persistence or pace . . . ."  TR. 17.  The ALJ further found that Sumpter "has the mental capacity to perform not only simple, repetitive tasks, . . . but that she also has the mental capacity to perform at least the mental demands of semi-skilled work activity . . . ."  *Id*.  In reaching this determination, the ALJ noted that Sumpter "appears to magnify/exaggerate all of her symptoms, as her responses were very vague . . . ."  *Id*.

The ALJ found that Sumpter had the residual functional capacity (RFC) to perform "light exertional work activity, or work that requires an ability to lift twenty pounds occasionally and

---

[1] Sumpter alleged that April 1, 2000, was the onset date of her disability.  TR. 43.  The ALJ found that Sumpter's employment as a telemarketer in 2002 constituted substantial gainful activity.  TR. 13.

lift/carry ten pounds frequently . . . ."[2]  TR. 19.  In reaching this conclusion, the ALJ acknowledged that Sumpter's obesity exacerbated her osteoarthritis and diabetes.  He concluded, however, that "there is just no evidence of record which supports a finding that the claimant is unable to perform the exertional demands of light work."  TR. 17.

The ALJ relied upon the definitions of jobs in the *Dictionary of Occupational Titles* to determine whether Sumpter could return to her past relevant work as a mail sorter (DOT 222.687-022/209.687-026), police department clerk (DOT 219.362-010/209.562-010), customer service representative (DOT 299.357-014), telephone solicitor (DOT 032.262-010), and social service worker (DOT 195.107-010).  TR. 18, 103-07.  The ALJ concluded that none of these jobs required more than the exertional and mental capacity that Sumpter possessed based on the his RFC assessment.  TR. 18-19.[3]  Consequently, the ALJ determined that Sumpter was not disabled.  *Id*.

Sumpter requested review of the ALJ's decision by the Appeals Council.  On April 30, 2004, the Appeals Council denied Sumpter's request for review.  TR. 4-6.  This appeal timely followed. Doc. No. 1.

---

[2] Pursuant to 20 C.F.R. § 404.1567(b), light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  The regulation further provides that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  *Id*.

[3] With respect to Sumpter's prior employment as a mail sorter, the ALJ found that although Sumpter may not be able to perform this job as she described it, she "still [had] the residual functional capacity to perform this job as it is described in the national economy."  TR. 18.

**II.      JURISDICTION.**

The ALJ's decision became the final decision of the SSA once the Appeals Council denied

Sumpter's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §

404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g).

**III.     STATEMENT OF FACTS.**

A.      *Sumpter's Testimony*.

Sumpter was born on November 2, 1959.  TR. 226.  She obtained a GED, and she earned an

associate's degree in "medical records."  TR. 226-27.  Sumpter is five feet tall and at the time of her

hearing she weighed approximately 300 pounds.  TR. 155, 226.

Sumpter is right-handed.  TR. 226.  Sumpter's past work history includes employment as a

records clerk, mail sorter, telephone solicitor, customer service representative, and social worker.

TR. 52, 64-71, 227.

Sumpter had high blood pressure, diabetes, depression, arthritis in her knees, elbows, feet

and wrists, chest pain, and depression.  TR.  228-30.  Sumpter testified that she had pain and

swelling in her chest area "like every day."  TR. 228.  Her joints were swollen every day.  TR. 229.

She took medication that gave her some relief from her symptoms.  TR.  232.

She also had memory problems.  Sometimes she would forget to take her medication and on

other occasions, she would take extra dosages.  TR. 229.  She cried and did not want to talk to

anyone.  TR. 232.  She also heard voices and talked to herself all day.  TR. 234.  She had gained a

great deal of weight.  TR. 58.  She did not have insurance to seek treatment.  TR. 228; *see also* TR.

132.

Sumpter used a cane to walk on some occasions, but not others. Sumpter had trouble walking short distances, such as from the ALJ's office to the parking lot. TR. 229-30. Sumpter was unable to walk up and down steps. TR. 230. She did not have trouble sitting, just getting up. TR. 231. She had handrails and a chair in the bathtub to assist her. TR. 231-32.

She did not have any feelings in the tips of her fingers. TR. 231. She had trouble picking items up off the floor. She also had tingling in her toes. She was unable to lift a gallon of milk with her left hand. TR. 231. Sumpter also had trouble sleeping at night unless she took her pain medication. TR. 232.

Sumpter did not prepare her own meals or do any laundry. TR. 233. When she went to the grocery store, she rode in an electric cart. *Id*. She does not have a driver's license. TR. 227-28.

B.      *Medical Evidence*.

Sumpter was treated by Edward Williams, Jr., D.O., from November 1998 to April 2000. Supplemental Transcript (Supp. TR.) 268-73. He treated Sumpter for hypertension, among other things. TR. 270-73.

On November 15, 2000, Jozef Hudec, M.D., examined Sumpter at the request of the SSA. Supp. TR. 283-85. She complained of dizziness, shortness of breath, dull chest pain, swelling in her legs, and depression. Supp. TR. 283. She was 5'1 ½" tall and weighed 251 pounds. Dr. Hudec observed that Sumpter was obese, but that she walked without an assistive device. Supp. TR. 284. She had full range of motion, and full grip strength bilaterally. Her affect was good, and her memory was intact. Dr. Hudec opined that Sumpter had no restrictions "in lifting, pushing/pulling,

walking, stooping, climbing." Supp. TR. 285. He noted no limitations relating to hand dexterity or strength. His impression was that Sumpter suffered from hypertension, depression and obesity. *Id*.


On January 20, 2001, Antonio J. Fernandez, M.D., performed a psychiatric evaluation of Sumpter at the request of the SSA. Supp. TR. 301-02. Dr. Fernandez observed that Sumpter appeared depressed and anxious. She admitted to crying jags, fatigue, and inability to concentrate. After simple testing, Dr. Fernandez opined that Sumpter's memory and concentration were within normal limits and that her judgment, insight, and intellect were average. Dr. Fernandez opined that Sumpter suffered from an adjustment disorder with mixed anxiety and depression. Sumpter's prognosis was "dependant on [her] ability to deal with her situational problems and in resolving her financial issues." Supp. TR. 302.

On April 6, 2001, Sumpter was seen at Nova Southeastern University (NSU). TR. 114. She complained of right chest pain and swelling which radiated up her neck. The pain interfered with her sleep. TR. 114. Examination revealed very tender breast and chest wall, and joint pain and numbness in her fingers. She was anxious and depressed, and heard voices. TR. 114. She was listed as "morbidly obese." *Id*.

On August 10, 2001, Sumpter was again seen at NSU complaining of pain and swelling in her chest, neck and right arm. TR. 111. The diagnosis was hypertension, neck pain that was a

combination of cervical radiculopathy and possible GERD,[4] chest wall tenderness and obesity.  TR. 112.

Sumpter was treated at H.O.P.E. on several occasions between October 15, 2001 and June 5, 2002.  TR. 117-145.  On her visit in October 2001, she complained of pain and swelling in her hands, elbows, feet and knees.  She had occasional chest pains and shortness of breath on exertion. The initial diagnoses included hypertension, obesity, depression, and osteoarthrosis.  TR. 143.  A chest x-ray showed cardiomegaly with probable mild congestive change.  TR. 137.  Treatment notes from November 2001 reflect improvement in hypertension, but other conditions remaining the same. She continued to complain of chest pain, and she reported being tired, weak, and having difficulty walking, with tingling in her toes.  TR. 127, 130, 133.

On November 12, 2001, Sumpter was diagnosed with uncontrolled diabetes mellitus.  TR. 129.  Sumpter took a stress test in December 2001 which was abnormal due to her poor aerobic capacity, but there was no sign of ischemia.  TR. 125.  In February 2002, she complained of chest swelling and dull pain.  She had not been taking her medication as required.  Upon examination, Dale S. Ryon, M.D., observed that both of her knees were swollen and tender, and that she had tenderness in the upper sternum.  Dr. Ryon observed that Sumpter had hypertension, diabetes, and morbid obesity.  Her chest pains were likely due to a chest wall syndrome.  She had arthritis in both knees that interfered with her ability to walk.  He treated her with medication.  TR. 120.  Treatment of these problems continued through at least June 2002.  TR. 116.

---

[4] GERD refers to gastroesophageal reflux disease, or a backflow of acid from the stomach into the swallowing tube or esophagus. INTERNATIONAL FOUNDATION FOR FUNCTIONAL GASTROINTESTINAL DISORDERS, ABOUT GERD, *at* http://www.aboutgerd.org (last visited Sept. 28, 2005).

On December 11, 2001, Sumpter was examined by R.V. Radin, M.D.  TR. 152-54.  Sumpter complained that she was experiencing "auditory hallucinations and paranoid ideation for the past year."  TR. 152.  Dr. Radin noted that Sumpter was weepy and depressed throughout the examination.  TR. 153.  Dr. Radin's diagnosis was that Sumpter suffered from depressive disorder not otherwise specified with some psychotic features, non-insulin-dependant diabetes mellitus, hypertension, and arthritis.  *Id*.  He assigned Sumpter a current Global Assessment of Functioning (GAF) score of 60.[5]  Dr. Radin treated her with medication.  TR. 154.

On January 4, 2002, Pio M. Sian, M.D., examined Sumpter.  TR. 155-58.  Dr. Sian noted that Sumpter had suffered a heart attack in 2000.  TR. 155.  She weighed 258 pounds.  *Id*.  Her upper and lower extremities were proportionately heavy with crepitus pain and swelling in both knees.  Sumpter was able to perform toe and heel walking, but with great difficulty.  She had hyporeflexia of both knees.  Her grip strength was slightly reduced in her left hand.  Sitting was painful.  TR. 156.  Dr. Sian observed spasms in Sumpter's lumbar spine.  She had full range of motion, but difficulty flexing her knees.  TR. 157.  Dr. Sian's impression was that Sumpter suffered from osteoarthritis, diabetes mellitus, questionable coronary artery disease and post myocardial infarction, morbid obesity, anxiety and depression.  TR. 158.  Dr. Sian noted that prolonged standing

---

[5]  The GAF scale is used to report an individuals's overall level of functioning.  A rating of 60 reflects:

> Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (SYNOPSIS OF PSYCHIATRY).

and walking brought about a lot of pain in Sumpter's knees.  She could lift and reach for two hours or more, possibly longer in a sitting position in a sheltered environment.  *Id*.

On January 11, 2002, Sumpter was examined by Librada Porciuncula, M.D.  TR. 151. Sumpter complained of suffering auditory hallucinations and paranoid ideations for a year.  Her sleep had been poor, and her energy was low.  Dr. Porciuncula noted that Sumpter was weepy and depressed throughout the interview.  She was oriented as to time, place and person, and her memory was "okay."  Her insight and judgment were fair.  Dr. Porciuncula opined that Sumpter had a depressive disorder not otherwise specified, with some psychotic features with a current GAF of 60. TR. 153.  Dr. Porciuncula continued to treat Sumpter through at least March 2002.  She continued to have auditory or visual hallucinations.  TR. 148, 151.  In January 2002, Dr. Porciuncula added a diagnosis of cognitive disorder not otherwise specified.  TR. 151.  Sumpter was gaining weight, walked slowly, and complained of pain in her knees in February 2002.  TR. 149.  She was still having difficulty falling asleep.  TR. 149.

On January 16, 2002, Ronald L. Seifer, Ph.D., examined Sumpter at the request of the SSA. TR. 161-63.  She weighed 257 pounds.  TR. 162.  Sumpter complained of a lack of energy, weight gain, and daily crying spells.  She was depressed and occasionally tearful.  She was no longer having hallucinations.  Dr. Seifer asked Sumpter a number of questions to evaluate her ability to reason and use commonsense.  Based on the results of his examination, Dr. Seifer observed that "[f]or a woman who is claiming an average high school education and a college degree, this is seen as a deterioration in her cognitive functioning."  TR. 163.  Dr. Seifer's impression was that Sumpter suffered from, among other things, mood disorder due to general medical condition with major depressive-like

episode, and the need to rule out a cognitive disorder not otherwise specified.  He opined that

Sumpter could follow simple one and two step directions, and that she was having some difficulties

with attention, concentration, and pace.  He also noted that she would have difficulty relating to

others in a work setting.  TR. 163.

On March 12, 2002, Sumpter was seen by Kory Casey, a chiropractor.  Sumpter complained

of chest wall soreness, knee and elbow pain and wrist swelling.  TR. 196.  She continued to have

difficulty sleeping.  TR. 195.  An x-ray showed joint space narrowing medially with prominent

hypertrophic spurring in her right knee.  TR. 192.  There also appeared to be joint effusion in her left

knee.  *Id*.

      C.    *Reviewing Physicians*.

On January 25, 2001, David L. Kirk, Ph.D., reviewed Sumpter's records an prepared a

psychiatric review technique.  Supp. TR. 287-00.  Dr. Kirk noted that Sumpter suffered from

affective disorders.  TR. 287.  Dr. Kirk further noted that Sumpter's mental impairments resulted in

mild difficulties in maintaining concentration, persistence, or pace.  Supp. TR. 297.

On January 20, 2002, M. DelaCerna, M.D., reviewed Sumpter's records and prepared a

physical residual functional capacity assessment at the request of the SSA.  TR. 164-71.  Dr.

DelaCerna opined that Sumpter could frequently lift ten pounds and occasionally lift twenty pounds.

She could sit, stand or walk (with normal breaks) six hours a day.  TR. 164.  Her ability to push

and/or pull was unlimited.  *Id*.

On February 1, 2002, Pamela D. Green, Ph.D., reviewed Sumpter's records and prepared a

psychiatric review technique form at the request of the SSA.  TR. 172-185.  Dr. Green noted that

Sumpter suffered from depressive and cognitive disorders with memory impairment.  TR. 172-74.

Dr. Green further noted that Sumpter's mental impairments resulted in moderate functional

limitations in restriction of activities of daily living, and difficulties in maintaining concentration,

persistence, or pace.  TR. 182.  Sumpter had mild difficulties in maintaining social functioning.  In

addition, Dr. Green indicated that Sumpter's mental impairments resulted in one or two repeated

episodes of decompensation, each of extended duration.  *Id*.

Dr. Green also prepared a mental residual functional capacity assessment.  TR. 186-89.  In

sum, Dr. Green opined that Sumpter had moderate limitations in her ability to understand and

remember detailed instructions, carry out detailed instructions, maintain attention and concentration

for extended periods, perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerance, and complete a normal work-day and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods.  TR. 186-87.

On May 16, 2002, Eric Wiener, Ph.D., reviewed Sumpter's records and prepared a Mental

RFC assessment at the request of the SSA.  TR. 197-200.  Dr. Wiener noted that Sumpter's mental

impairments resulted in moderate limitations in her ability to understand, remember and carry out

detailed instructions, and in her ability to maintain attention and concentration for extended periods.

TR. 197.

Dr. Wiener also prepared a psychiatric review technique form.  TR. 201-14.  Dr. Wiener

noted that Sumpter suffered from affective disorders.  TR. 201.  Dr. Wiener further noted that

Sumpter's mental impairments resulted in moderate functional limitations in restriction of activities

-11-

of daily living and difficulties in maintaining concentration, persistence, or pace.  TR. 211.  Sumpter

had mild difficulties in maintaining social functioning.  *Id*.

On June 19, 2002, a physician whose name is illegible reviewed Sumpter's records and

prepared a physical residual functional capacity assessment at the request of the SSA.  TR. 215-222.

The physician opined that Sumpter could frequently lift ten pounds and occasionally lift twenty

pounds.  She could sit (with normal breaks) six hours a day.  TR. 216.  However, she was only able

to stand and/or walk for a total of two hours in an eight-hour work day.  *Id*.  Her ability to push

and/or pull was unlimited.  She could only occasionally climb, balance, stoop, kneel, crouch, and

crawl.  TR. 217.  The physician opined that Sumpter was only capable of performing sedentary work

due to pain in both knees.  TR. 221.

## IV.     STANDARD OF REVIEW.

This Court's review of a final decision issued by the SSA is limited to determining whether

the ALJ's factual findings are supported by substantial evidence and whether the ALJ applied the

correct legal standards.  *McDaniel v. Bowen*, 800 F.2d 1026, 1029-30 (11th Cir. 1987) (per curiam).

While a great deal of deference is paid to the ALJ's factual findings, "[n]o similar presumption of

validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to

be applied in evaluating claims."  *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam).

The Court must view the record as a whole, taking into account evidence favorable as well as

unfavorable to the SSA's decision.  *Id*. at 1000.  Even if the Court finds that the evidence weighs

against the SSA's decision, it must affirm if the decision is supported by substantial evidence.

*Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The Court may not reweigh the evidence

-12-

or substitute its own judgment for that of the SSA.  *Id*.  When reviewing a final decision issued by the SSA, this Court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."[6]  Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry which must be followed in determining whether a claimant is entitled to OASDI benefits.  In sum, when evaluating a claim for benefits under OASDI, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?
(2) Is the claimant's impairment severe?
(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
(4) Is the claimant unable to perform his or her former occupation?
(5) Is the claimant unable to perform any other work within the economy?[7]

An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."[8]

---

[6] 42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

[7] 20 C.F.R. § 404.1520(a)(4).  In an OASDI case, a claimant must establish that he or she was disabled during the time that she was insured under the act.  *See* 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

[8] *See, e.g., McDaniel*, 800 F.2d at 1030.

-13-

## V.      ANALYSIS.

Sumpter raises a multitude of issues on appeal.  First, she contends the ALJ erred in finding that she could return to her past relevant work because he rejected the opinion of an examining physician and failed to develop the mental demands of her past relevant work.  Next, Sumpter argues that her RFC was not properly evaluated both because of the improper evaluation of her mental limitations and the failure to recognize the exertional limitations arising from her impairments. Sumpter further asserts that her complaints of pain and other subjective symptoms were not properly evaluated.  Sumpter also contends the ALJ failed to comply with Social Security Ruling (SSR) 02-1p when considering the impact of her obesity on her ability to work.  Finally, Sumpter asserts that the ALJ failed to consider all of her impairments in combination in evaluating her disability.

I begin with the ALJ's assessment of Sumpter's mental impairments, because I find that issue to be dispositive.  The ALJ accepted the opinions of reviewing psychologists that Sumpter had moderate limitations in her ability to maintain concentration, persistence, and pace.  TR. 16. Nevertheless, the ALJ essentially rejected Dr. Seifer's opinion that Sumpter could perform only simple, repetitive tasks, and concluded that she had the mental capacity to perform semi-skilled work.

Dr. Seifer was a consulting psychologist who actually examined Sumpter, in comparison to the psychologists who only reviewed Sumpter's records.  As such, Dr. Seifer's opinion was entitled to greater weight than that of the reviewing psychologists unless the ALJ articulated specific and adequate reasons for disregarding it.  *See* 20 C.F.R. § 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not

-14-

examined you."); *cf. Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985) ("[T]he 'opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.' *Oldham v. Schweiker,* 660 F.2d 1078, 1085 (5th Cir. 1981) (Unit B)."). The ALJ did not do so.

Furthermore, it is difficult to reconcile the ALJ's conclusion that Sumpter would have moderate limitations in her ability to maintain concentration, persistence, and pace with his conclusion that Sumpter could perform semi-skilled work. The SSA regulations define semi-skilled work as follows:

> Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. *Semi-skilled jobs may require alertness and close attention* to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

20 C.F.R. § 404.1568(b) (emphasis added). As indicated in the italicized portion of this definition, semi-skilled work can require "close attention," which appears to be inconsistent with moderate limitations in concentration.

The failure to give appropriate weight to Dr. Seifer's opinion is not harmless error. The *Dictionary of Occupational Titles* (DOT) provisions that the ALJ relied upon to determine the past relevant work Sumpter could perform reflect that each position required a general education development (GED) reasoning level between two and five.[9] The DOT definitions of these reasoning

---

[9] DOT 222.687-022, Routing Clerk, reasoning level 2; DOT 209.687-026, Mail Clerk, reasoning level 3; DOT 219.362-010, Administrative Clerk, reasoning level 4; DOT 209.562-010, General Clerk,

levels reflects that level two requires the ability to "[a]pply commensense understanding to carry out detailed but uninvolved written or oral instructions," while reasoning level five requires the ability to apply "principles of logical or scientific thinking to define problems, collect data, establish facts, and draw valid conclusions." *See Dictionary of Occupational Titles*, App. C, at Westlaw DICOT Appendix C.  A person with the mental functional capacity to perform only "simple one and two step directions," as found by Dr. Seifer, would likely have difficulty performing jobs at reasoning levels three and higher, and might have difficulty performing jobs at reasoning level two. *See, e.g., Mead v. Barnhart*, No. Civ. 04-139-JD, 2004 WL 2580744, at *2 (D.N.H. Nov. 15, 2004) ("[A] 'GED' reasoning level of 2, or higher, assumes that the applicant is capable of more than simple repetitive tasks.") (citing *Lucy v. Chater*, 113 F.3d 905, 909 (8th Cir. 1997); *Cooper v. Barnhart*, No. 03-CV-665-J, 2004 WL 2381515, at *4 (N.D. Okla. Oct. 15, 2004); and *Hall v. Barnhart*, No. 03-299-P-C, 2004 WL 1896969, at *3 (D. Me. Aug. 25, 2004)); *but see Money v. Barnhart*, 91 Fed. Appx. 210, 215  (3rd Cir. 2004) (regarding reconciling the opinion of a vocational expert with the DOT, the court stated that reasoning level two was consistent with the functional capacity to perform only simple, routine, and repetitive work).

For these reasons, the case must be remanded to permit the SSA to reassess Sumpter's mental functional capacity, giving due weight to the opinion of treating and examining professionals, and then determining whether Sumpter could perform past, relevant work in light of her physical and mental functional capacity.  On remand, the ALJ should also give careful consideration to the

reasoning level 3; DOT 299.357-014, Telephone Solicitation, reasoning level 3; DOT 032.262-010, User Support Analyst, reasoning level 4; DOT 195.107-010, Caseworker, reasoning level 5. *Dictionary of Occupational Titles*, Westlaw DICOT.

medical testimony in the record that indicates that Sumpter's morbid obesity may aggravate the pain on weight-bearing joints, which assessment will be relevant to the determination of the length of time Sumpter can stand and walk.  *See* Soc. Sec. Ruling 02-1p, 2000 WL 628049 (Sept. 12, 2002).[10]

**VI.   CONCLUSION.**

It is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida this 29th day of September, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties

---

[10] Social Security Rulings are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).